23-3100. Presiding Judge Hartz, and may it please the Court, I am Brad Schrosman, representing the State of Kansas Defendants in this matter. The thrust of this case is whether a third party, like the Voter Participation Center, has a First Amendment right to pre-fill someone else's advanced ballot application. And, assuming that such a First Amendment right does exist, what sort of deference is owed to the State? The answer to that first question, in our judgment, is a symphatic no. A third party pre-filling an application of someone else entails neither speech nor expressive conduct. Any message comes from the cover letter in this case, not from the application itself. There is nothing expressive about inserting a voter's name and address on the voter's own application. Not only is the cover letter separable from the application, but there is nothing intrinsic on the application itself that would necessitate its partial pre-population in order to convey VPC's message. When you say separable, they come in the same envelope for a reason, right? Yes. It's part of a mailing package where they include the cover letter and then inside of it is an application as well as an envelope that's pre-addressed and prepaid. And the reason is because you have to look at each of the submissions inside the envelope to understand what's going on. Well, that is correct. But that also makes it clear in the explanatory cover letter, that's what tells the voter why it's included and their message. The statute here doesn't actually include, it doesn't prohibit them from including a blank application. It doesn't include them from explaining anything that they want to, from sending it anything they want to. But any expressive conduct would come from the cover letter itself explaining why that material is included in the overall package. What if the package didn't have it pre-filled but had a separate sheet with little sticky labels, and one was name. And it said, peel this off and put it in blank number six. Would that be okay? Well, under our statute, as long as the application itself is not pre-filled, then I don't believe that that would violate the statute. So, this is all coming down to whether or not it's already typed in or whether you have a separate label that you peel off and try to put into the right space and may screw up and cause all kinds of problems by putting it in the wrong space? The reason this statute came about, Your Honor, is that in the 2020 election, there were a significant number of errors that were included in the pre-populated applications that DPC sent out. We had approximately 15,000 to 25,000 that were sent to voters that were erroneous. Five percent of the applications that they sent out included an erroneous middle initial or name. Three percent, which is about 25,000 in applications, three percent include the suffix. And if those are sent in and it's incorrect on the application, that can disenfranchise voters. Because if any part of that application is completed incorrectly, then the county election office is required to reject the application and the voter is not going to be able to get it. I thought before they were required to reject it, they were required to reach out to the person who sent in the erroneous information. That's correct, Your Honor. Kansas has an elaborate cure mechanism, but of course that is a very time-consuming process for the county election officials. When it is sent to the voters erroneously, it causes, and did cause, very significant confusion and frustration. And in certain cases, if there's just a small error, a letter left off, a Jim rather than a James, something like that, the election official is able to just disregard the error. Isn't that right? That is correct. What did the record show as to the number of those types of errors? Well, the record didn't talk about what those, the record talked about simply what the errors that were sufficient enough to warrant an outright rejection of the application. And what we, the VPC's expert came in, one of their witnesses came in, and said that overall, nationally, they had, again, 5% of the applications that they had pre-filled were included in an erroneous middle name or middle initial. And there's no question that an erroneous middle name or middle initial, or an erroneous suffix, you know, it's saying junior when it's not a junior, senior versus, you know, third, whatever, that that would cause a rejection of that application if it was sent in to the county election office. That would require a rejection, you're saying? I'm sorry, say again? I'm a little confused. You're saying that would require a rejection? Yes, that is correct. But I thought you answered Judge Carson that if it's using a J instead of Jim, so James didn't require a rejection. Does it or doesn't it? What the county election officials who testified said, if it is clear from the application that it is that individual. So when someone puts in James Smith and it's this address, then that, and he's in the election records, is Jim Smith, and that will, you know, if the county election official is able to discern that that, in fact, is that voter. But when you have individuals where it says John Q. Jones as opposed to John T. Jones, that's a different individual. So you said 5% of the ones that came in were incorrectly filled out. Do you know how many of those were rejected? No. Do you know how many of those were accepted on their face? Even though it wasn't filled out correctly, it didn't cause a problem because the election official said, oh, this is clearly James Smith.  One, the numbers were their numbers overall, so they, what they had said was is that they didn't know the exact numbers in Kansas, but they didn't deny, you know, that, I mean, no one knows for certain how many of that came in Kansas. But the reality is, is that we don't know for certain because we, of the elaborate care mechanisms that we do have in the state, when an election official goes and, you know, a very lengthy, complex process to call up the voter, writes them and says, hey, you know, we got this, it looks like it's the wrong address or the wrong name. I mean, eventually it may well have been cured, but that was only after a very significant time frame. Does the record indicate how much time and effort was spent because of errors? Yes. There is testimony in the stipulated facts that election officials could spend as much in an individual application when they had to call. I mean, it depended on what stage it was. It could be up to 30 minutes to, for each application that included erroneous information where they had to contact the voter. Okay, but that's interesting that it could take that long and there were this many where it could have happened. Do we know if, in fact, election officials were spending considerable amounts of time caused by improperly pre-filled applications? Yes. There is testimony in the record from Andrew Howell, the election commissioner for Shawnee County. There is... What did he say about this? He said that it was an extremely time-consuming process, that he was having to deal with voters who were either confused and frustrated about the applications that they were getting that had been pre-filled. And also, he talked about the amount of time that he was having to spend dealing with the curative process. So, that I'm sure I understand, is the problem with the James and the Jim and so forth that the information that's pre-filled differs from the Elvis information. Yes. Okay, and so if the voter solicitation people cured that problem and went solely with Elvis, then all of the what you just said goes poof. There's no problem with pre-filled at that point. There could be a problem. Number one, let's be clear that that's not what happened, that they were using an outside vendor who merged commercial information. I understand and concede at that point. But I'm asking, the crisis that's being described here as far as time spent and wasted and upset people and so forth, if the information pre-filled matched Elvis, which is possible, that can be done, then goodbye to your argument. Goodbye what now? Well, do you have an argument at that point? Well, yeah. The state still has, in the 2020 election, there was very substantial confusion and frustration and anger among the voters. And the burden on the plaintiff's conduct, in our judgment, is incidental at best. All we're talking about is the pre-filled application. And when you look at cases like O'Brien, I think it would be Anderson-Burdick anyway, but I think that this test that the Supreme Court has applied in this context, it's basically a rational basis test. And that's what, as you know, the Sixth Circuit held in the recent Liptenstein case. Let me phrase this question differently. Sure. There would be no problem for the state if the statute said you can't file, you can't send pre-filled applications unless the pre-filled information is from Elvis. That would solve your problem. I think that would help the problem. I mean, you'd have, you'd still have the issue of timing. So when, as our expert witness talked about, they were pre-printing the applications, you know, early in the year in 2020. And at that point, because Elvis is a dynamic system, it changes in real time, you would have individuals who had moved, who had changed their name, maybe a marriage or whatever. So when they were getting the applications, it was obsolete. I mean, that information had changed since the time that the pre-filled application had been printed. But yes, I will concede that if it was strictly based on that information, that would go a long way towards addressing the state's issues. That's not what occurred here, though. Also, you said filling out a form is not expensive activity. Normally, you think of anything someone writes as equivalent to speech. Do you have, do you have any authority that there's no First Amendment interest in filling out an application? I would say, I would first look to the city of Austin case where the Supreme Court made clear that merely words on a page don't make it into the First Amendment regime. And that was one of the things that the district court argued is, well, it's words on a page. But, I mean, the court has said that that's not enough. There needs to be, the message needs to be overwhelmingly apparent. We cited the court in Rumsfeld even cited the Gibney case where the court says, look, the mere fact that it's written words doesn't mean that the First Amendment is necessarily implicated. So, I think that both city of Austin and Rumsfeld and Gibney have made clear that mere writing on it does not trigger the First Amendment automatically. And that's, I think, a fundamental error that the district court made. So, I think what is, what ultimately is, has the, what their applications were, were a matter of convenience. And we talked about in the stipulated facts the harms that came about because of the, these erroneous prefilled applications. We talked about, obviously, the errors in the middle names and initials. And that was conceded. It came from VPC's own witness, which are, you know, talking 15 to 25,000 of them. Our expert witness talked about applications that were sent to individuals who'd been removed from the voting rolls long before the mailing packages were even sent. People who had died. People who had, who had moved. And that caused frustration among the electorate when some of them were sent in. But the person died. Tell me what problem arises because the person died. Some of those, some of those were actually sent in to the election office. Now, those individuals ultimately did not receive a ballot because the anti-fraud mechanisms kicked in. And, but it also, there are a lot of. So, those sent in, that was fraudulent? What's that? Those that were sent in. There were some sent in, some were sent in, and some of them, the voters sent it in because they're saying, wait a minute, why are we getting this? Why would you have sent this, somebody sent it to me, because the, you know, this individual has died. But they submitted it seeking, well, okay, so they sent it in to the election officials, but did they actually send in a request for a ballot? I don't know that there is evidence that the individuals, that someone sent in an application seeking it on behalf of a deceased person. I mean, the record doesn't say anything on that one way or the other. Are the cases that are most apt, the initiative, referendum sorts of cases, someone with a clipboard, please sign, we want to ban nuclear weapons or something like that, and that's treated with strict scrutiny, right? Well, and as we said very clearly, the initiative referendum process is fundamentally different because when you're going around collecting that referendum, the writing itself constitutes expressive speech. The voter's signature, the report in the Supreme Court said that the voter's signature on the referendum expresses his view. So if your opponents were to knock on a door and say, we've got a form here we want you to fill out, write in on line number one, John Q. Public, and write on six, check that you're male, then you're fine with that. That's perfectly permissible. Even if it's wrong. Even if it doesn't match Elvis. Well, the only thing that is impermissible under this statute is the mailing, unsolicited mailing of prefilled applications. But you're not curing the problem. If you're allowing that, and who knows? They don't know what Elvis has, whether it has a suffix or a middle initial or something, and they just write their name, then it's going to be rejected. Well, if a voter, if the VPC were to go to a voter and say, hey, fill this in, and they said, don't worry about what your name is, but write this. No, no, no. Nobody's saying anything like that. Okay. I'm saying Jim and James. Okay. And you're saying it's okay to knock on the door and say, write James Smith in there, and unbeknownst to everybody, Elvis has it as Jim Smith, it's going to get rejected. Well, those are issues where the county election office, though, is going to be able to tell who the identity was. We're talking about the problem here generally has become erroneous middle names and middle initials. There's no question. Judge, we may be chips in the night, so I don't want to chew up any more of your time. Okay. I see I'm out of time anyway, so. Thank you. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court, Jonathan Youngwood for the appellant. Your Honors, I want to focus on what the district court found regarding much of what was the subject of discussion with counsel, which is that the record suggests on balance that personalizing advanced mail ballot applications actually facilitates orderly and efficient election administration. She reached that conclusion based on a very full record. In front of her were affidavits and depositions from five election officials, two experts, two representatives of my clients. State the conclusion, the finding she made again. The record suggests that on balance, personalizing advanced mail ballot applications actually facilitates orderly and efficient election administration. And what was that based on? What was the evidence? We heard the evidence that errors in this can cause a lot of problems. Among other things, Your Honor, the testimony of these election officials, which are summarized in the stipulation facts in the appendix at page 611, largely through 613 or 614, included within that is testimony from Mr. Howell that counsel referred to. At paragraph 140, Mr. Howell is asked how much time his staff spent curing applications that contained prefilled information. And he said he doesn't actually count the difference there. And this, again, was their best witness for them. He was asked in paragraph 141 whether it was his opinion that voters become even more confused and frustrated when the application contained prefilled information. And he testified, I don't think that the prefilled information in and of itself was what all the concern was. In fact, if you had a statute... Is that the same witness who said it took a lot of time, a lot of their time, to deal with applications that had been misfilled out in advance? Yes, but he did not differentiate. Well, witnesses can be inconsistent, and I submit that's why we have district courts to sort through them. But what you cited was his saying, we didn't count the time. Well, there is no testimony that they specifically counted the time. There is no testimony... So he could still estimate the time and testify to that. He did some estimates that, obviously, if you get a misfilled out ballot, it will take more time to process than a completely... But I just want to clarify this because it's... Yes. You're both talking about the same witness and saying very different things, and I want to see if there's a way to reconcile. I understood from opposing counsel that this witness said it took a significant amount of time, maybe it was a number, maybe not, to deal with the applications that had erroneously prefilled out information. Did he not say that? He does say that, Your Honor, but he also does not have any specific count, and I think what's significant, he draws no distinction, nor could one, I think, between a misfilled preprinted application and a misfilled handwritten or typed by the individual. He didn't... There is no record evidence, nor I think there's any evidence whatsoever, as to whether prefilled applications cause more likelihood of error than handwritten applications. I thought you said 5% of the prefilled applications. What was that? That's not... That 5% is in the record, Your Honor. That's not what the 5% is. So, 5% was an estimate that our client gave at his deposition of nationally, an estimate nationally of mailers they sent, how many had some form of error. The defendant's expert in this case, taking a sample of the more than 500,000 mailers sent to Kansas citizens, came up with the conclusion that in Kansas it was 3%, but that is 3% of the mailed, not 3% of the received. And so, I would submit, for example, if the error was in the address, it probably was never received and then never sent to the county. There is no evidence, no evidence of the errors as a percentage, or anything frankly other than anecdotal, of how many errors were sent in from a prefilled form sent by our client. And what... Is the whole form filled out? Is everything... No, no, Your Honor, because that's not available. Do you have to sign them? You do, Your Honor. And what might be helpful, if you haven't seen it, the form itself is a sample, is in the appendix starting at page 674. And what I'd like to do maybe briefly is to get to that question, just to walk through what's in it, because as Your Honors have noted, it's a package. So, page 674 is the cover. And for this example, it's to a Jane Smith at 123 Main Street at Anytown, Kansas. It's just a sample. Ms. Smith gets a letter. This is at page 675 saying, Dear Jane, County election officials in Kansas encourage voters to use mail ballots in upcoming elections. And that's true. I think that Kansas is a wonderful state in that way. I've sent you the enclosed advanced ballot-by-mail application already filled out with your name and address. The letter goes on, and again, there's no dispute here that this letter is speech. And it's not just speech, but it's core political speech entitled to the highest form of protection of the First Amendment. At the bottom of the letter, there's a P.S. We have already filled in your name and address on the enclosed form. Please take a minute to complete this form, sign and date it, and place the form in the pre-addressed postage-paid envelope. And nothing so far is barred by the statute. It's only the application where you can't insert. I would say, in my view, of course, well, Your Honor, I don't know. I think if the statute is to be enforced in full, I can't write a letter saying, please find a ballot I filled out in part 4. The statute says no portion of such application shall be completed prior to mailing such application. So I could, I suppose, send this letter and then include a blank. The reader would be confused by me saying it, but that is correct. There's nothing illegal about writing this, and they don't challenge the letter. So I, regrettably, because of our connectivity here, I can't get the appendix up. But what does the recipient have to fill out? So, page 676, when you have the opportunity, the recipient would need to, so on this is the name and the address, nothing else, and the county. The recipient needs to give their own driver's license number or non-driver's identification card number. That's not available to our clients through the services. They have to fill that out. They need to fill out, under item 4, the address to where the mail ballot should be sent. So somebody's filling, you've got to fill that out or it's not going to work. And they need to sign it, date it, put their phone number. How about the date of the election? That looks like that's built in. That is the date, yes it is, right in paragraph 5 for the signature. That's prefilled, you say? The date of the election to which you're requesting the ballot. And that helps, right? Because most people don't know the day of the election. I would think you probably, again, Your Honor, there is no evidence. I'm just giving you my common sense. I would think that if this information, go ahead, Your Honor. I want to make sure I understand. So that is part, so it's the name and address plus the date of the election are prefilled out. That is correct. And the county. And the county, and nothing else. And yet there are significant things that need to be filled in by the applicant. The driver's license number, the address to send the ballot. Does it really make any difference? I guess I'm wondering, I know that here we are in federal court, but aren't most people going to know their name and fill it in? I think, Your Honor, it gets to why my client does this. And they do this because their message is voting by mail is easy, safe, and you can do it. And we've gone to the trouble ourselves of populating this. That's a strength of the speech. It goes to, I think, the volume and the magnitude of the speech. And it goes to, frankly, under this court's precedence and the Supreme Court precedence, it's up to the speaker to decide how their speech can be most effective. Okay. And the reason our client does this is they think it conveys a stronger message by doing this. All right. One thing that I'm trying to get to the bottom of, and that I think I know the answer to, all of the commotion about it's creating all these problems, there are mismatches and so forth, you have two possibilities. Number one, you don't pre-fill and you get a certain number of the middle initials wrong or something. Or you do pre-fill and that happens. Or you don't pre-fill. There's still going to be mismatches with Elvis, right? Someone's going to write Jim instead of Jane. So, Your Honor, the errors here came from a vendor who didn't purely pull Elvis. You could. We don't have that statute here. But if Elvis is the be-all, end-all, it's the match that you have to have to avoid a problem, the person filling in the application doesn't know how their name is on Elvis. Absolutely, sir. And so that person can inadvertently make a mistake that causes rejection by using a Jim or James, just like the pre-filled can. Correct, Your Honor. If the pre-fill came from Elvis, there'd actually be a lower risk of error than a higher risk. Can you do better? Your organization, which is to say it comes from commercial and it gets contaminated with that, time lags, people have died, moved, so forth. Why shouldn't you be held to something that requires Elvis within a certain amount of time? Your Honor, that would be a different law and I'd have to have different arguments if I wanted to challenge it. If you go to, when it goes to under strict scrutiny, what's the least restrictive mean of satisfying an overriding state interest? I question, I understand preventing election fraud is definitely an overriding state interest, but there is absolutely, absolutely no evidence that this statute was directed to that. Listening to the prior argument, it bears mentioning in the stipulated facts at 138, there's no legislative history here supporting any of the reasons. But if your concern is confusion or duplicates, there are many less restrictive means. For example, if your concern is duplicates, you could have passed a law that says, like my client sent these to people up to five times. You could say, well, I don't think that's a law we would support, but I have to come up with a different challenge to it. You could say it has to come from Elvis and it has to come from Elvis within a certain number of weeks or months, because where the Elvis will differ from reality is, I don't know, somebody gets married and he or she changes their name. So you're saying there are least restrictive ways of doing this? This statute fails that test. If their concern were duplicates, voter confusion, inaccuracies, there are, and I can't come up with all of them, but there are significantly less restrictive means. And we know why that matters with heightened scrutiny. Does it matter for Anderson-Burdick? So we don't think Anderson-Burdick applies. It's not content neutral. This is not a content neutral statute. Would it matter for Anderson-Burdick? Well, under Anderson-Burdick, if it did, it would go to whether or not this imposes a substantial burden. And we would argue that even under Anderson-Burdick, even under Anderson-Burdick, you would get there that this statute isn't properly crafted. And you didn't ask, but even under intermediate scrutiny, which we do not believe you get to, obviously to a somewhat lesser degree, it's a substantial state interest rather than overriding. And the words are different and, I agree, lesser than strict scrutiny. But this statute would not survive intermediate scrutiny and it would not survive an Anderson-Burdick analysis. Let me pursue some of this. You're satisfied with the question? Satisfied with the forenum. I'm curious, what is the expressive, what is being expressed, what is the expressed message by filling out the form? And why isn't a ban on filling out the form not just a time, place, and manner restriction? You can say anything you want, whatever you're trying to express here, you just can't do it on that form. So, Your Honor, on time, place, and manner, which in part, I think, was what? Go to the expressive part. Go to the expressive first? Sure, Your Honor. Give me one second. So, first of all, Your Honor, the form is not just part of the package. We would say it's the centerpiece of the package. And so, as the briefs argue, it's integrated. They've conceded the letters for political speech. The letter is tied to it. Say we were to think that the only thing banned by the statute is filling out the form. What expression are you losing? Let's say all we did was send the form. No letter. Because I think with the letter, the letter carries it whether or not. Well, I'd rather you answer my question if you want to answer this question. So, what is expressive about the form is it says to the voter... About filling out the form. Filling out the form. This is how easy it is to fill it out. We've started the process for you. That's one. Two, one would assume that it cost us some amount of resources to fill it out. And we are saying we care so much about voting by mail that we've taken a step for you in that direction by taking the care. I recognize if it's an error, there's less care. By taking the care to pre-populate it. That sounds like an expression, but it's expressive conduct. By doing this, we're expressing something. It's not that filling out the form itself is the expression, but by doing this, we've expressed something. That is correct, but that falls within this circuit's Christ-Pressman decision. We think it falls within the Supreme Court's Clark test. So, what's the Clark test? Is it intended to be communicative? That's not disputed. That's accepted by the other side. This was intended by our clients objectively to be communicative. And in context, would reasonably be understood by the viewer to be communicative. So the question, which the district court, hearing all the evidence ruled on, is getting a packet where the form's filled out versus not filled out. Will that say something to somebody? But then, the question is, isn't this restriction essentially a time, place, and manner restriction? On that expression. It is not. Just like you can, picketing is expressive conduct, but you can't do it at certain places at certain times. So, counsel cited the city of Austin. Again, court will look at it itself. That's a clear time, place, and manner way to location. Location of speech, not whether there was speech. And then, the Rumsfeld or... I'm being simple-minded. It says, you can do this anywhere except on these documents. Why is that not a limitation on time, place, and manner? Because the act of putting them on the documents is the speech. Or the expression. We're saying, fill out a form. We believe you should fill it out. We started it for you. And, Your Honor, it differs from the Rumsfeld case that they've cited extensively. And that was a case involving the military recruiters on campus. And what does it mean if you don't have a military recruiter? And do you need to have a statement with it? And the court there, cited by this district court, but by the Supreme Court, says, when you're asking a military recruiter to be off campus, it's a little unclear, or let me say it differently, because to ask is to tell people, so I have to take that out. When somebody sees that a military recruiter is off campus, what does that mean? Well, if the Supreme Court held, it could mean that your rooms were full, and there wasn't room for them. It could mean that the recruiter chose to be off campus for some reason. Or it could mean that the institution didn't want them there. And so without an additive statement, we don't know what it meant. This is, go ahead, Your Honor. I just realized that time's going to run out. So I'm going to, do you have any questions? No. Do you have anything? Thank you, Your Honor. Okay, thank you. A minute? Well, a minute and a half. A minute and a half. Just a few points quickly. The first is that the, I would urge this Court to read the Sixth Circuit's recent decision, Lichtenstein, which, in that case, the Tennessee had prohibited the distribution of any advanced, absentee ballot applications, whether they were prefilled or not, and the Sixth Circuit upheld that under the O'Brien Intermediate Scrutiny. But I would also simply point out, Your Honors, that they themselves, when we talked about, you know, gee, what are the harms here, they themselves, the VPC, was sufficiently concerned about the erroneous applications that they stopped in prefilling them on two of the five mailings that they sent out to voters. So, I mean, that is incredibly powerful evidence that the state's harms here were not made up and that the legislature had very solid reasons for engaging in this activity. Well, their concern might not be the same as yours. Yours is the burden on the election officials, and theirs is wasting people's time. Even the voters were so concerned, Your Honor, that they included a Q&A in their call center for voters to address voters calling in saying, hey, I was sent an erroneous application, or I was sent an application for someone else, what should I do? And they encouraged them to request a different application. So these are not made-up harms at all. And finally, I would just note that the standard on, so I think that even if you find that there is some expressive activity, we win on the intermediate scrutiny or Anderson verdict, whichever one you choose. But I would also simply point out that under the Rumsfeld standard, the expression, the communicative conduct has to be overwhelmingly apparent. At the end of the day here, what they've done is simply a matter of convenience. Thank you. Thank you, Your Honor. Thank you very much, Your Honor. Very interesting argument. Counsel are excused. Case is submitted.